Lee, J.
I concur with the counsel in thinking that the most important and material question in this cause arises upon the demurrer to the declaration: and that is whether taking the declaration in its broadest sense and strongest import, and disregarding all matters of form and all technical defects and omissions which might be remedied or supplied, such a case is alleged as entitles the plaintiff in the action to *546 recover against the defendant for the injury alleged to have been sustained.
The declaration (as amended) consists of three counts. The first alleges that the defendant being a body corporate created by act of assembly, was clothed with certain rights and privileges and charged with certain duties pertaining to the navigation of the Kanawha river among which was the duty of keeping the river within the line of their improvements free from all obstructions to the navigation; -that this duty it had failed to perform; that it had suffered a large snag to be and remain in the river at a certain point specified as “ in the neighborhood of Seven mile rock about seven miles above the mouth of the river in Mason county and within the line of their improvement,” whereby the navigation of the river was obstructed ; and that by reason thereof the plaintiff in navigating the river with a boat loaded with salt struck and stove his boat upon the snag whereby both boat and cargo were wholly lost.
The second count alleges that one of the duties of the company was to place buoys in the Kanawha river to indicate the entrance of the sluices, wing dams and jetties, and generally the courses of the channels, and also to cause beacons to be placed on the bars rocks and other obstructions to the navigation which though not within the channels or sluices yet from their positions or other causes were likely to endanger the safety of boats and vessels navigating the river but that the company in disregard of this duty had failed to place a beacon at or upon a large snag in the river about seven miles from the mouth at or near the Seven mile rock, which snag from its position in the river did endanger the safety of vessels and boats navigating the same and that by reason of such neglect, the plaintiff had stove a boat with which he was navigating the river upon the snag and both it *547 and a large cargo of salt with which it was freighted were wholly lost.
The third count alleges that it was the duty of the company to remove all depositions and obstructions in the channels and passages of the river which might impede the navigation, but that in disregard of this duty it had unlawfully permitted a large snag to be and remain in the river at the same point designated in the two previous counts being a portion of the line of the company’s improvement; by reason of which the navigation was greatly obstructed, so that a boat with which the plaintiff was navigating the river ran against and was stove upon the snag, and both it and its cargo were wholly lost.
The act of assembly referred to in each of the counts of the declaration is the act entitled “ an act incorporating the stockholders of the James river and Kanawha company,” passed March 16, 1832. After a preamble reciting that the measures theretofore adopted by the general assembly for the purpose of connecting the tide water of James river with the navigable waters of the Ohio had been found inadequate to effect that object by such a line of transportation as the public interest required, the act provided for the op'ening of books for subscriptions to the capital stock of a new company in which the state was to take ten thousand shares; and when three-fifths of the stock should have been subscribed by persons other than the commonwealth and the required sum paid on each share, the company was to be incorporated by the name of “ The James River and Kanawha Company,” with the usual rights and incidents, and declared to be to every intent and purpose in law the successors of the then James river company. By the twentieth section, the whole interest of the commonwealth in the works and property of the James river company was transferred to the *548 new company to be held for the use of the stockholders ; and the new company was declared to be thenceforward (after the period at which the transfer was to take effect) entitled to all the tolls rents and other emoluments, rights privileges and immunities enjoyed by the James river company subject however to the incumbrances limitations and restrictions in the act declared. By the twenty-second section the new company was charged with the duty of connecting the tide water of James river with the navigable water of the Ohio by one of three plans of improvement at their election, that is to say, either by a continuation of the lower James river canal to some point not lower than Lynchburg, a rail road from its western terminus to some convenient point on the Kanawha below the falls and an improvement of that river thence to the Ohio so as to make it suitable for steamboat navigation; or secondly by such a combination of the canal and a rail road from its western terminus to the Ohio; or thirdly by a continued rail road from Kichmond to the Ohio.
By the twenty-sixth section it was provided that if the western termination of the rail road should be at any point on the Kanawha above its mouth, then the navigation of that river thence to the Ohio should be improved by locks and dams or otherwise so as at all seasons of the year to afford a safe and convenient navigation for steam boats of not less than one hundred tons burden.
By the twenty-seventh section the company was required to commence its works within two years after the passing of the act and to finish them within twelve years after the first general meeting of the stockholders, on pain of forfeiting their charter and property which in that event were declared to be vested in the then existing James river company for the benefit of the commonwealth. By the act of the *549 6th March 1833, the time within which the works were to be commenced was extended to the end of two years after the passage of that act and twelve years allowed for the completion of the works after the first general meeting of the stockholders. By the act of March 1, 1847, this time was extended to the 25th of May 1S59, and is therefore not yet expired.
By the forty-sixth section of the act of 1832, the company was authorized upon the completion of the improvements upon the Kanawha river as therein directed, to demand and receive on articles transported by water on their line of improvement, in lieu of the tolls then authorized by law, such as the company might assess not exceeding certain rates per ton per mile specified in the act; and until the river should be rendered navigable in the manner prescribed from the terminus of the rail road to the mouth of the river, it was authorized to demand and receive such tolls as it might assess not exceeding those then allowed by law.
Turning now to the provisions of the several acts concerning the James river company, it will be seen at once that a new and very different improvement of the Kanawha river was contemplated by the act of 1832 from that projected by the former. By the second section of the act entitled “ an act to amend the act entitled 4 an act for clearing and improving the navigation of James river,’ and for uniting the eastern and western waters by the James and Kanawha rivers,” passed February 17, 1820, the company was required to proceed to render the Kanawha from the falls to the Ohio navigable at all seasons for boats of three feet draught, according to the plan of the principal engineer in his report to the Board of public works made in January 1820. This improvement was plainly not intended by the legislature to he a complete and perfect improvement of the river, but to be in its charac *550 ter partial limited and sporadic. The plan of the engineer referred to proposed only to improve the navigation at different points specified along the river by opening sluices through certain shoals, deepening the channel in particular places, removing rocks at certain points and the like; and the particular places at which work is to be done are all plainly set down and an estimate made of the probable cost of the work necessary to be done at each. At all other places the natural state of the river is assumed to be sufficient to afford an ordinary navigation of three feet in depth. Under the provisions of that act, a continuous and connected improvement was not contemplated. The intended improvement was to consist of a succession of works at the different points named, the river elsewhere and between the different works of the company, being assumed to be an open navigable highway in regard to which no duty is imposed by the act upon that company. The act of February 24,1823, to make more effectual provision for carrying the former into effect, refers to the mode of improvement as contemplated by that act, and the plan of the engineer is thus made as much a part of both acts as if embodied in them at length, nor until the act of 1832 creating the James river and Kanawha company, was any change made or any different plan adopted for the improvement of the Kanawha.
If this view of the nature of the improvement designed by the acts concerning the James river company needs any confirmation, it will be found in the amounts authorized to be borrowed for the purpose of completing the works with which it was charged, which would seem to be comparatively inconsiderable and such as would only suffice for works of a partial and limited character; and especially the very moderate sum which the improvements on the Kanawha were to cost according to the engineer’s estimates and *551 which must have been in the contemplation of the legislature at the time; and in the character of the several tariffs prescribed for the tolls which were different times authorized to be collected by the former company. All of these as well that of the act of 1820, that in favor of the salt interest of the act of February 28, 1821, that of the act of March 1, 1828, and that of the act of February 27, 1829, unlike that prescribed by the act of 1832, were specific tolls fixed at an arbitrary rate having no refei’ence to the distance navigated; whilst the tolls authorized by the act of 1832 for the new improvement which was to afford a constant navigation for steam boats of an hundred tons burden, are all graduated by a scale of exact distance navigated, and not to exceed a given rate per ton per mile.
By the terms of the act of 1832, the tolls authorized to be taken for the new improvement of the Kanawha river, were only to be collected when the improvements on the same should have been fully completed as by that act authorized and directed; and in the absence of any express provision in the act upon the subject, it would seem clear that the company could not be held liable for an injury to an individual occasioned by any neglect or breach of duty on its part in respect of the new and more perfect improvement of the river projected by the act until it had entitled itself to demand the tolls thereby provided upon the completion of its works, or had exercised the right to demand such tolls upon the assumption that the works had been completed. The right to demand the tolls and the liability for neglect of the duty upon the performance of which the tolls were authorized, are reciprocal and correlative: the tolls are the remuneration to the company for its expenditures on its works and the consideration and basis for any legal liability that may be cast upon it for any *552 omission or neglect of duty in respect of the new works with which it was charged.
Now there is no express provision in the act in regard to liability for neglect of duty in reference to the improved navigation of the Kanawha river. The subject of such liability is left by the act to the general principles applicable to the case and to the relations in which the company stands to the public and individuals. That the company may upon proper allegations be held liable for an injury to an individual navigating the Kanawha occasioned by neglect of its duty in reference to the new improvement with which it was charged after it shall have exercised the right to demand the tolls provided by the act (which is in effect an affirmation upon its part that it has completed its works according to the requirements of the act) I entertain no doubt. It is not a public corporation representing the public and administering public funds for the benefit of the public, but it is a joint stock company which has undertaken the construction of a work useful to the public certainly but intended for the private emolument of the stockholders in dividends of the profits. There can be no good reason why such a corporation should be exempt from liability for injuries occasioned by its neglect. It is a maxim of the common law that one specially injured by a breach of duty in another shall have his remedy by an action; and the case of a corporation should be no exception. It undertakes its corporate duties by its own consent and receives can equivalent for their performance. And it may be considered now well settled that such a corporation will be liable for damages specially occasioned to an individual by a breach or neglect of its corporate duties. Mayor of Lynn v. Turner, Cowp. R. 86; Yarborough v. Bank of England, 16 East’s R. 6; Townsend v. Susquehanna Turnpike Co. 6 John. R. 90; Riddle v. Proprietors of Locks and Canals on Merrimack River, *553 7 Mass. R. 169 ; Chesnut Hill T. Co. v. Rutter, 4 Serg. & Rawle 6. That the state owned a large interest in the stock of the company will not vary the case. The act of incorporation declares that it may sue and be sued, may plead and be impleaded; and a mere interest taken by the commonwealth in the stock would not be sufficient to bring an action against the company for neglect of its corporate duty within the influence of the decision in the case of Sayre v. The Northwestern Turnpike Road, 10 Leigh 454, and the class of cases upon the authority of which that case is supposed to have been decided and which are referred to by Judge Allen in delivering his opinion in the case of Dunnington v. The Northwestern Turnpike Road, 6 Gratt. 160, 171.
But in order to charge the company with the consequences of a neglect of duty in reference to the new and more perfect improvement projected by the act of 1832, a proper case showing that it was so responsible, and setting out the nature of the duty and the character of the supposed liability must be distinctly alleged. If it be not averred that the company had taken possession of the river under its charter and had completed its new works according to the requirements of the act, or had demanded and collected tolls according to the improved tariff authorized by its charter, enough at least should be averred to show that in point of time place and circumstances the company was chargeable with the consequences of neglect of duty in reference to the new improvement. Row of the three counts in the declaration the first is the only one which can be supposed to have any reference to the new duties imposed upon the company for the purpose of effecting the more perfect improvement of the navigation of the Kanawha designed by the act of 1832. The second and third counts although they speak of duties with which the company was *554 charged by the act of 1832 in reference to the navigation of the Kanawha, yet are plainly founded upon the ninth and tenth sections of the act of the 27th of February 1829 prescribing certain duties to be performed by the James river company in reference to the navigation of the Kanawha contemplated by that and previous acts concerning that company, and which duties it is assumed devolved upon the James river and Kanawha company by the provisions of the act of 1S32 in anticipation of the more perfect improvement required by that act. But this first count only alleges in general terms the duty to remove obstructions within the line of its improvement and the failure to perform that duty, specifying the obstruction complained of. It does not specify whether the supposed duty related to the new improvement or to the previous navigation of the river confided to its charge. It does not aver that the company had elected the plan which makes the Kanawha river a part of its line of improvement nor that it had completed its works and taken possession of the entire water line by exercising or claiming to exercise the right to demand the improved tolls according to the act of 1832; it does not charge a failure to render the river navigable for steam boats of the specified tonnage, nor does it contain any other sufficient averments to charge the company as for a breach of corporate duty in its failure to provide the new and improved navigation required by the provisions of that act.
I think it clear that the liability sought to be asserted in this case cannot be maintained upon the ground of any neglect or breach of duty on the part of the company in failing to provide the more perfect navigation required by the twenty-second and twenty-sixth sections of the act of 1832; and if it can be successfully asserted, it must be on the basis of its succession to the rights of property, privileges and *555 franchises of the James river company and by consequence to the burdens and duties devolved upon that company by the laws then in force.
Counsel have argued it is true that no liability to an action at the suit of a party injured even by its neglect of duty devolved upon this company in virtue of its succession to the former company’s rights and duties, because it succeeded as well to the privileges and immunities enjoyed by that company as to its rights and duties, and that one of those immunities was exemption from liability to be sued by an individual for neglect of duty, because as it is said, the James river company was but the agent of the commonwealth, administering public funds and holding only in trust for the commonwealth, and thus as being in effect the commonwealth itself for the purposes of the acts, was not liable to any such action. But I cannot assent to this reasoning. Even if it be conceded that the James river conqiany was not liable to an action upon the principle of the decision in Sayre v. The Northwestern Turnpike, it by no means follows that the present company would be entitled to the same exemption. The reason of that case cannot apply to this. The exemption from liability to be sued is a privilege peculiar and personal (so to speak) to the commonwealth and does not extend to her assignee any more than would her privilege not to be sued for land claimed by her extend to her grantee of the land. The transfer of the “privileges and immunities” of the James river company was not intended to place the James river and Kanawha company above the law and to leave individuals who might be specially injured by the neglect of its corporate duties without remedy or redress. It would be grievously unjust that such a corporation should be clothed with a privilege of this character only properly pertaining to the sovereign authority of the state, and there is no sufficient reason for supposing *556 that the legislature ever intended to confer it upon this company.
I think therefore whether the James river company would have been liable or not for neglect of its duties in reference to the “convenient navigation” of the Kanawha river contemplated by the act of 1820 and the subsequent acts concerning that company (a question upon which it is unnecessary to express any opinion) that the present company having taken upon itself the performance of those duties in consideration of the privileges conferred upon it and among the rest of the right to demand the tolls allowed to the Janies river company until the new improvement should be completed, will be liable for any breach or neglect of duty in reference to the navigation of the Kanawha which it was bound to keep up until the new works should be completed, to any one sustaining special damage thereby in the same manner as it will be liable for neglect of its corporate duty in reference to the more perfect improvement contemplated by the act of 1832 after it shall have placed itself in a condition to be subject to such responsibility.
But to subject it to such liability the neglect of duty must be plainly and sufficiently alleged. It must be charged that the injury complained of was occasioned b,y some act or omission of the company for the consequences of which it was legally responsible. The enquiry then occurs what were the duties of the James river company required to be performed with a view to render the Kanawha river “ conveniently navigable” as contemplated in the preamble to the act of 1820.
Now, as has been already stated, it is clear it was not made the duty of that company to provide a perfect and complete navigation of the Kanawha throughout its entire length from the falls to the Ohio. Before the act of 1S20 was passed it appears that the *557 Board of public works had caused a survey to be made by the principal engineer of the James and Kanawha rivers and of the intermediate country with a view to the commercial communication which it was desired to establish between the eastern and western waters of the state. In January 1820 a detailed report was made by the engineer of the results of his exploration and examination, accompanied by his recommendation as to the plan and mode of improvement by which the desired communication might be effected, and his estimates as to the cost of the works and the amount of expenditure necessarily involved. Amongst the rest is the plan proposed by him for the improvement of the Kanawha river. Every mile from the falls to the mouth is examined, the state of the navigation, as found, reported and the mode and method of improving it specified particularly. The different points at which work is required and the kind of work at each point, are stated with great precision and particularity. Upon the intermediate portions of the river where no work is required to be done it assumed that in its natural state the river afforded a sufficient navigation for ordinary purposes, and estimates are furnished of the cost of the works that would in the opinion of the engineer suffice to secure a navigation of three feet at all times. The total amount of these estimates is twenty-nine thousand six hundred and fifty dollars. This report was adopted by the legislature as the basis of its legislation on the subject; and by the act of 1820, the James river company was directed to make its improvement of the Kanawha upon the plan thereby proposed. It is clear therefore that a limited and partial improvement only was contemplated by the legislature and not an entire connected improvement throughout the whole course of the river below the falls. Unlike the act of 1832 which required a navigation for steam boats of a *558 certain tonnage to be provided by locks and dams or whatever other means might be found necessary, throughout the entire length of the river below the western terminus of the rail road (if the combined method of a rail road and a river navigation should be adopted) the act of 1820 only required the improvement of particular places in the river upon a prescribed plan. Thus it only contemplated such an improvement of the navigation as the execution of the detached works prescribed by the engineer’s report would afford. It was assumed that this mode of improvement would insure an ordinary navigation of three feet. But if this expectation should not be realized the company could not be held responsible. It was responsible that the required works should be constructed in conformity to the plan of the engineer, and that they should be kept in proper repair. For although there is no express provision in the act of 1S32 requiring the James river and Kanawha company to keep the works in repair, I think it is their duty so to do. They are entitled to collect tolls according to the rates of former laws until the improvement required by the act of 1832 shall be completed; and it is impossible to suppose that the legislature intended they might abandon all the old works suffer them to become entirely useless for want of repairs, and yet permit them to demand the tolls allowed for the improvement which in a proper state of repair they afforded to the navigation. I consider that to keep the works in a sufficient state of repair so as to afford such aid to the navigation as was intended by the act of 1820, is the condition of the right to demand the tolls, and that such demand amounts to an affirmation on the part of the company that they were in such a state of repair. I do not mean by this that a party could successfully resist the payment of tolls by alleging that the works were not kept in proper *559 repair. What I mean is that the company would be liable for special inj ury occasioned to an individual by reason of its works not being kept in the condition required by law. Beyond this however, its liabilities cannot be carried. If the works were executed upon the prescribed plan, and kept in due repair, the company cannot be held liable for losses not attributable to any default or neglect on its part, but occasioned by defects or insufficiencies in the plan of improvement or which occurred outside of its works upon those portions of the river which were reported by the engineer as not requiring any improvement and which were therefore not placed by the act in charge of the company.
To charge the company then with the consequences of an injury sustained by a party in navigating the river it must be distinctly averred that it was occasioned by some unlawful act of the company or its omission or neglect to do or provide something which the report of the engineer or the law required. It should at least be averred that the place at which the alleged injury occurred was one of those at which the company was required to do the necessary work for the improvement of the navigation and that the injury was occasioned by its default.
How in this respect the first count is plainly defective. The allegation is that it was the duty of the company to keep the river free from obstructions within the line of its improvement which duty it failed to perform. This is not a sufficient allegation that the obstruction occurred in any part of the company’s works or at any place which the company was bound to keep clear of obstructions. The James river company had no line of improvement in the sense intended in the declaration. The phrase appears to be borrowed from the act of 1832 which treats the entire river below the western terminus of the rail road as *560 occupied by the line of the company’s improvement, and graduates the tolls according to the distance navigated ; but it can have no application to the particular improvement in detached parcels and in different places required by the acts concerning the James river company. It is too vague and indefinite at best to fix the place intended within the limits of the company’s works or to designate it as one of those at which the company was charged with the duty of improving the natural navigation of the river. But this count not only fails to show that the place in question was one of those which the company was charged with the duty of improving, but in point of fact it shows very distinctly that it was not. The place of the injury is sufficiently identified as being “in the neighborhood of the Seven mile rock about seven miles above the mouth of the river.” Now if we turn to the engineer’s report we find that for fifteen miles above the mouth of the river he pronounces the navigation good in the natural state of the river and requiring no improvement of any kind whatever. TIis plan of improvement requires nothing whatever to be done below the seventy-ninth mile (computing from the Great falls) which terminates fifteen miles above the mouth of the river; and thus the place at which the injury is alleged to have been sustained was one at which no duty devolved upon the company in reference to the navigation of the river and for the sufficiency of which it was no more responsible than any other person whatever.
I think it clear therefore that the first count wholly fails to make out any case to charge the company with the consequences of the injury and loss alleged to have been sustained.
The third count is obnoxious to very much the same objection as the first. It does not sufficiently allege that the place at which the injury of which it *561 complains occurred was one of those at which the company was required to make any improvement hy the report of the engineer or the acts which adopted it. The breach of duty of which it complains was in the failure of the company to remove depositions and obstructions in the passages sluices and channels of the river, which it is alleged it was its duty to remove in order that such passages sluices and channels might afford a free and unimpeded navigation. The count is evidently framed under the tenth section of the act of February 27, 1829, upon an entire misconception as I think of the true intent and meaning of that section. It proceeds upon the assumption that that section makes it the duty of the company to remove depositions and other obstructions in all the passages sluices and channels of the river, whether artificial or natural. Such is not the meaning of the section. It did not intend to require any new improvement or any work to be done at other places than those specified in the engineer’s report. It was not the purpose of the act to extend the company’s charge and responsibilities over those portions of the river which had been reported as affording a sufficiently good navigation in its then condition. The true object was to cause the works that had been constructed upon the engineer’s plan, to be repaired and reinstated in the condition in which it was contemplated they should be kept by the engineer’s report. The passages, sluices and channels spoken of were the artificial passages sluices and channels produced by the works of the company constructed upon the engineer’s plan and which it would seem had become obstructed by depositions of sand gravel and timber impeding the navigation through them, and not the natural channels of the river at other places. This is apparent from the terms of the section which require the obstructions to be removed so as to restore to the channels sluices and passages *562 referred to, the width and depth of water produced in them by the works then recently constructed upon the river; and it is confirmed by the limited amount of the expenditure authorized for the purpose which was not to exceed one thousand dollars. I think therefore this third count equally fails to make a case of such neglect of duty on the part of the company as would charge it for the consequences of the injury complained of.
The remaining count is the second which alleges the neglect of duty on the part of the company to consist in the failure to place a beacon or beacons at or upon the snag in the river which occasioned the injury. This count is evidently framed upon the ninth section of the act of February 27,1829, but as I think, under a misconception of the true meaning of that section. The bars rocks and other obstructions upon which it was made the duty of the James river company to place beacons were such as were of a fixed and permanent character then in the river or at the banks or in such other positions that they might endanger the navigation. They were such as formed part of the natural features of the river. It was not designed to require beacons to be placed upon a casual, temporary, movable impediment such as that specified in the declaration. A tree which having been adrift, had accidentally become stationary in the river forming whilst it remained in that position “ a snag” could not have been within the meaning of the legislature. It might be in a given place on one day and in a different on the next; and with the first rise of the water if not sooner, it would probably disappear entirely. Such an obstruction as this would not admit of the erection of a beacon upon it and is to be guarded against and avoided by the care and vigilance of those engaged in the navigation. This count therefore I think without any just foundation to sustain it.
*563 The views which I have thus expressed all go to the foundation of the action, and thus it becomes unnecessary to express an opinion upon any other of the questions raised and discussed by the counsel. The only remaining question is as to the disposition of the case if the demurrers to the declaration be sustained. If the defects were merely in the statement of the case and might be remedied by a proper amendment, then according to the settled practice of this court, the cause should be sent back to the Circuit court to give the party the opportunity to make such amendment. But such is not their character. They are defects in the very substance of the case itself, and such as cannot be helped by any amendment consistent with the allegations and proofs in the record before us. These all show that the party has and can have no cause of action against this company for the loss which he has sustained. I think therefore no useful purpose can be answered by sending the cause back and that it should be finally determined here.
I am of opinion to reverse the judgment and render final judgment for the plaintiff in error.
The other judges concurred in the opinion of Lee, J.

Judgment reversed, the demurrer sustained, and final judgment thereon for the defendants.